# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**UNITED STATES OF AMERICA and**
**THE STATE OF MICHIGAN,**
**[UNDER SEAL],**

        Plaintiffs,

v.

**[UNDER SEAL],**

        Defendant.

Case No: 22-11590
Hon. Gershwin A. Drain
Mag. Elizabeth A. Stafford

**FILED UNDER SEAL**
**PURSUANT TO**
**31 USC § 3730(b)(2)**

---

**MACWILLIAMS LAW PC**
Sara K. MacWilliams (P67805)
838 W. Long Lake Rd., Suite 211
Bloomfield Hills, MI 48302
(248) 432-1586
sm@macwilliamslaw.com

**THE HOWARD LAW FIRM, PLC**
Derek T. Howard (P69625)
838 W. Long Lake Rd., Suite 100
Bloomfield Hills, MI 48302
(248) 237-7300
derek@howardfirmplc.com

*Attorneys for Plaintiffs*

---

# COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, 31 USC § 3729 et seq, AND MICHIGAN MEDICAID FALSE CLAIM ACT, MCL § 400.610a(1)
# JURY DEMAND

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**UNITED STATES OF AMERICA and
THE STATE OF MICHIGAN,
ex *relator* ERIK OLSEN,**

       Plaintiffs,

v.

**TENET HEALTHCARE
CORPORATION,**

       Defendant.

Case No: 22-11590
Hon. Gershwin A. Drain
Mag. Elizabeth A. Stafford

**FILED UNDER SEAL
PURSUANT TO
31 USC § 3730(b)(2)**

---

**MACWILLIAMS LAW PC**
Sara K. MacWilliams (P67805)
838 W. Long Lake Rd., Suite 211
Bloomfield Hills, MI  48302
(248) 432-1586
sm@macwilliamslaw.com

**THE HOWARD LAW FIRM, PLC**
Derek T. Howard (P69625)
838 W. Long Lake Rd., Suite 100
Bloomfield Hills, MI  48302
(248) 237-7300
derek@howardfirmplc.com

*Attorneys for Plaintiffs*

---

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL
## FALSE CLAIMS ACT, 31 USC § 3729 et seq, AND
## MICHIGAN MEDICAID FALSE CLAIM ACT, MCL § 400.610a(1)

## JURY DEMAND

Relator Erik Olsen ("Relator"), through his counsel, MacWilliams Law PC and The Howard Law Firm, PLC, for his Complaint, states as follows:

## **INTRODUCTION**

1.     This is an action filed by Relator pursuant to the Qui Tam provisions of the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., to recover damages and penalties arising from the submission of fraudulent claims to the United States and the Federal Medicare and Medicaid Programs.

2.     This action is also filed by Relator pursuant to the Qui Tam provisions of the Michigan Medicaid False Claim Act ("MFCA"), MCL § 400.610a(1), to recover damages and penalties arising from the submission of false claims to the State of Michigan Medicaid Programs.

3.     With respect to Relator's Federal and Michigan False Claims Act claims, Relator has complied with the notice provisions of both the Federal False Claims Act, 31 USC § 3730(b)(2) and the Michigan Medicaid False Claims Act, MCL § 400.610a(2) by serving the Attorney General of the United States for the Eastern District of Michigan, and the Michigan Attorney General, Health Care Fraud Division, simultaneous with the filing of this Compliant, with a statement of material evidence and information related to this Complaint, which support the existence of the false claims by Defendants.

4.      Relator is a highly respected emergency medicine physician and residency director that has been working at the hospitals owned by Defendant since his residency (2006-2009).

5.      Due to his position and experience at the hospital, Relator has intimate knowledge of the practices and procedures at such hospitals, affording him a unique view that has resulted in his discovery of highly illegal conduct by the for-profit corporation currently running the hospitals where he has spent his successful career.

6.      Relator has a spotless resume and is well respected throughout the US emergency medicine field.

7.      Defendant Tenet Healthcare Corporation ("Tenet Health") is a for-profit corporation that has been the subject of previous qui tam lawsuits involving different, also illegal, actions.

8.      Tenet Health's actions as complained of herein are extremely profitable to Tenet Health and its shareholders and thus Relator anticipates that Tenet Health will aggressively deny these allegations and defend with any number of theories and accusations.

## PARTIES AND JURISDICTIONAL ALLEGATIONS

9.      Relator Erik Olsen is a citizen of the United States of America and resident of the State of Michigan, County of Washtenaw.

10.     Relator is suing on his own behalf, and on behalf of, and in the name of, The United States of America, pursuant to 31 USC § 3730(b) and the State of Michigan, pursuant to the qui tam provision of Michigan's Medicaid False Claims Act, MCL § 400.610a(1).

11.     Relator has complied with the notice provisions of both the Federal False Claims Act, 31 USC § 3730(b)(2) and the Michigan Medicaid False Claims Act, MCL § 400.610a(2) by serving the Attorney General of the United States for the Eastern District of Michigan, and the Michigan Attorney General, Health Care Fraud Division, simultaneous with the filing of this Compliant, with a statement of material evidence and information related to this Complaint, which support the existence of the false claims by Defendants.

12.     Defendant Tenet Health is a publicly traded, for-profit corporation (NASDAQ: THC) with its headquarters located in Dallas, Texas. Tenet Health operates 65 hospitals and over 450 healthcare facilities.

13.     This Court also has supplemental jurisdiction over Relator's claims pursuant to 28 U.S.C. § 1367.

## FACTUAL ALLEGATIONS

### Tenet Health Purchases and Operates the Detroit Medical Center and Takes Over Detroit Receiving Hospital

14.     Detroit Receiving Hospital is a Level One trauma center primarily serving low-income urban residents.

15.     Due to the variety of traumas that routinely pass through Detroit Receiving Hospital, it is a highly sought after place for emergency room doctors to train and attracts exemplary students from all over the United States.

16.     Detroit Receiving Hospital is part of a medical system that has long been known as the "DMC," or Detroit Medical Center.

17.     The DMC has for years suffered regular financial crises due to the expense and strain of operating in a low-income area with high acuity.

18.     In 2010, the DMC was sold to Vanguard Health Systems ("VHS").

19.     VHS went public in 2011.

20.     In 2013, Tenet Health purchased VHS which included the DMC.

21.     Since 2013, Tenet Health has owned and operated the DMC.

22.     Since Tenet Health's acquisition of the DMC, there have been numerous reports about the quality of healthcare declining as a result of Tenet Health's for-profit agenda.[1]

---

[1] Report: Concerns about 'apparent decline' at DMC (freep.com), Fired cardiologists sue DMC, Tenet, alleging retaliation for quality complaints | Crain's Detroit Business (crainsdetroit.com), Michigan nurses' union accuses Tenet-owned Detroit Medical Center of slashing charity care spending | Fierce Healthcare

23.     Relator has had a first-row seat to the changes in DMC management and how those changes have impacted patient care.

### Co-Relator's Two Decades at the DMC

24.     Relator has spent his entire medical career at the DMC.

25.     He first began working at the Detroit hospitals currently owned and run by Tenet Health as a medical student (Wayne State University Medical School, 2002-2006).

26.     Medical students spend the second two years of their four-year education doing "rotations" observing and assisting with medical care in different medical specialties.

27.     Wayne State Medical School, a downtown Detroit medical school founded in 1868, has for many years partnered with the DMC, which allows its students to have access to world-class training experiences and provides the hospital with the additional support and labor that comes with running a teaching hospital.

28.     Relator is a Michigan native who grew up in suburban Detroit and attended the University of Michigan for his undergraduate studies.

29.     He was well liked by the DMC staff and encouraged to apply for residency at the one of its hospitals, Detroit Receiving Hospital.

30.     Relator was "matched" to train at the DMC and began his three-year emergency medicine residency at the Detroit Receiving Hospital in 2006.

31.     Excelling in his residency training, Relator was elected Chief Resident by both the staff and his residency peers.

32.     Given his success and natural ability with patients, students and staff alike, Relator was recruited to remain within the DMC hospital system, and he accepted a job with the ground that staffs the hospital ER department after residency graduation.

33.     Relator has been a board-certified ER physician since 2009.

34.     Due to his teaching abilities, Relator was appointed Associate Residency Director at the DMC within a few years of coming on staff (2014) and ultimately rose to become the Residency Program Director in 2018, where he currently supervises the medical training over 42 young physicians.

35.     Relator has held an assistant professor of clinical education position at Wayne State Medical School since 2011 (promoted to Associate Professor in 2021) and an adjunct assistant professor of clinical education position at Meharry Medical College Department of Surgery since 2020.

36.     In addition to practicing medicine full time and working as the Residency Director, Relator also conducts medical education research and has been involved in a variety of medical research projects, both on his own and as a mentor to younger physicians.

37.     Recently, Relator was selected as Physician Partner of the Year by the nursing staff at Huron Valley Hospital, one of the Detroit Medical Center hospitals where he has staff privileges.

38.     This background and current position provides Relator with intimate knowledge of the DMC and its operations, since from 2002 through today, he has been working at the Detroit Receiving Hospital consistently at all levels, first as a student, then a resident, and as a practicing physician and residency staff, which has required him to spend considerable time working in its intensive care units ("ICU") and emergency rooms ("ER"), and interacting with other departments.

39.     The Detroit Medical Center and its owner, Tenet Health, do not employ emergency room physicians to staff the ER and ICU directly; rather, the hospital has a contract with a separate entity, Medicine Center Emergency Services ("MCES").

40.     MCES is a nonprofit, academic organization dedicated to the management and oversight of all emergency medicine resident physicians at the DMC hospitals.

41.     Relator is a member of the MCES Board of Directors.

42.     MCES's role in supervising and training young physicians provides Relator with additional administrative access about patient admittance and quality reports that is not otherwise afforded to most DMC staff physicians.

43.     In addition to his professional duties, Relator is a devoted husband (his wife is an ICU nurse) and father of three young boys.

**Boarding Delays Not Reflected in Billing**

44.     During the Covid-19 pandemic, many hospitals, including the DMC, began to suffer staff shortages, especially nursing staff.

45.     When there are not enough staff available to properly care for admitted patients, patients are boarded in the ER (that is, waiting to be moved out of the ER into a different, specialized floor) for far longer than medically reasonable.

46.     Tenet Health, like most large hospital organizations, took advantage of federal relief money available to assist medical organizations during the pandemic, including over $936 million in grants from the United States Provider Relief Fund and over $1.5 billion more in relief from Medicare Advance Payments and payroll tax match deferrals.[2]

47.     Amidst accepting all this federal aid, Tenet reported record profits. This led Senators such as Elizabeth Warren to publicly call out Tenet's management of federal healthcare dollars, without the detail of what Tenet Health is doing on the ground. *Id.*

---

[2] Warren, Markey, McGovern, Trahan Call Out Tenet's Corporate Greed During COVID-19 Pandemic | U.S. Senator Elizabeth Warren of Massachusetts (senate.gov)

48.   In Relator's assessment, Tenet appears to be using its record profits to further invest in surgical centers, which are typically pure profit generators, rather than providing the necessary ER and ICU care for its Detroit patients.

49.   However, Relator discovered that the issue is much deeper than simple private equity-style greed that concerned Senator Warren and other public figures are concerned about. At the same time that it was furloughing staff for claimed budget reasons and allegedly struggling to recruit and retain sufficient nurses to provide the necessary standard of care in the ER and ICU department, Tenet was continuing to bill for acute medical care *as if the staff was actually providing the care, when there was no such staff present to provide the care*.

**Hospital Billing Procedures May Hide Tenet Health's Ongoing Fraud**

50.   Tenet Health is using the widely-reported market shortage of nurses as an excuse to keep staffing levels artificially low. While this creates some increased risk of malpractice, it also provides an enormous source of ill-gotten profits.

51.   Hospitals such as the Detroit Medical Center hospitals bill Medicare and Medicaid on the Prospective Payment System, or PPS, which is intended to motivate hospitals to structure cost-effective, efficient patient care avoiding unnecessary services that might otherwise get billed on the fee-for-service system. This results in a flat dollar amount being provided based on principal diagnosis,

complications and comorbidities, age, gender, and discharge destination. PPS billing runs from the admission to the discharge.

52.     Acute hospital care is billed based on the assumption that patients in acute states require high levels of care. Additionally, PPS permits additional fees for teaching hospitals such as the DMC (indirect medical education, or IME fees) and additional fees for particularly difficult, outlier cases (increased IPPS).

53.     In short, reducing staff below safe levels for long acute care stays at a teaching hospital such as the DMC can be enormously lucrative under the PPS billing system.

54.     Relator has never been contacted by Tenet Health billing professionals seeking to confirm that specific care ordered in the medical records was actually provided.

55.     Relator has never been contacted by any Tenet Health compliance officer seeking to confirm that care Tenet Health billed Medicare or Medicaid for was actually provided to the patients as reflected in patient charts and records.

56.     Relator understands from his years at the DMC and working in a leadership position with higher access than staff physicians  that Tenet Health's billing practices are solely based on information contained in patient charts and medical records.  But as provided herein, said charts and medical records are

substantially inaccurate because Tenet Health consciously chooses to not staff the DMC at levels that would ensure the billed-for care was actually provided.

57.    Tenet Health billing professionals are necessarily billing solely based on the medical records and patient charts they are provided – rather than the care actually provided to Tenet Health patients.  If Tenet Health billing professionals were billing Medicare or Medicaid based on actual care provided, which is different from patient medical records and charts, then those billing professionals would need to be in constant communication with Relator and other care providers, but Relator has never experienced (or heard of) such communications.

58.    Tenet Health may claim that they cannot possibly be engaging in medical billing fraud without this being picked up by audits. This would be inaccurate. Medicare does some tracking and Comprehensive Error Rate Resting ("CERT") audits, which are posted publicly to show how the hospital compares to other area hospitals, but CERT audits review medical records and focus on logistical issues such as whether coding and billing are correct and are typically triggered due to factors such as unusually high patient volume; they do not typically have the on-the-ground access that Co-Relator does. Thus, these audits would not necessarily discover that actual ICU patients in the ICU for legitimate acute care reasons are not truly receiving the care billed for.

59.     Tenet Health may also suggest that any fraud would have been picked up on an Office of the Inspector General (OIG) independent audit. While the OIG has conducted audits of the Detroit Medical Center hospitals, they do not appear to have uncovered the problem of patients with acute symptoms not getting the treatment the hospital bills for because again, these primarily utilize records rather than day-to-day operations.

60.     In fact, red flags that usually trigger audits, according to medical billing experts, are indications that a hospital system is billing at higher rates than other comparable area hospitals; thus, hospitals that carefully follow the PPS guidelines do not typically trigger in-depth audits that would uncover this level of fraud.

61.     At Tenet Health, as is the case with most hospitals, medical billing is handled by billing and coding professionals that are not directly connected to what is happening on the hospital floor.

62.     As soon as a patient is ordered admitted to the ICU, Tenet Health begins billing for ICU care.

63.     When hospital staff is actually present and able to carry out the physician's orders, there is little disconnect between the activities on the floor and the hospital billing.

64.     Historically, this medical billing practice makes sense, because it operates on the assumption that the hospital staff are actually providing the necessary care to carry out the physician's orders.

65.     With the intentionally-low staffing currently at Detroit Medical Center hospitals, however, there is often a major disconnect between what is being billed for and actual care provided to a patient.

66.     For example, a patient on May 29, 2022 was admitted to the Neuro ICU for seizures and placed on a ventilator, treatment that cannot be done in the ER and requires an ICU bed, but the patient stayed in the ER and remained on a ventilator, thereby artificially increasing the ICU time even though she wasn't physically able to get to the ICU because of staffing:



67.     Relator made a MIDAS report about the patient and documented it via email, because by that point he knew he was unlikely to hear follow-up:



**Increased Boarding Times Increase Time in ERs and ICUs**

68.    Relator made a MIDAS report about the patient

69.    Even pre-pandemic, the DMC pushed the envelope in how long they kept someone in the ER after receiving admission orders, which was a concern of the now-expired DMC Legacy Oversight Board[3], but since the pandemic, this has been taken to extremes.

70.    During the pandemic, Relator became increasingly frustrated with unnecessarily long ICU visits for patients that were not receiving timely and proper treatment.

71.    In attempt to remedy the issue, Relator both raised his concerns verbally and sent emails to hospital administrators about his concerns that the lack of

---

[3] DMC Legacy Board's last oversight report says system kept most pledges (detroitnews.com)

appropriate care was leading to situations in which the hospital was boarding patients for too long and failing to provide the necessary standard of care.

72.     Initially, Relator was, like many physicians in the hospital, frustrated primarily with the patient quality drop-off.

73.     Upon additional investigation, Relator began to watch the admission records (which his position at MCES provides him access to) and realized that Tenet was billing for services that he knew from his personal experience in the department were not being delivered.

74.     MCES has a robust corporate compliance system to ensure that its residency is always in compliance with federal regulations, which includes ensuring that it does not have clone documentation, is in EMTALA [Emergency Medical Treatment and Labor Act, 42 U.S.C.  1395dd], compliance, and is fully reviewing cases that are referred to the compliance team.

75.     MCES's corporate compliance process provided Relator with unique insight into what is happening at Tenet Health.

76.     When an ER physician such as Relator places an order for a patient to be admitted into a hospital, the patient is supposed to be transferred to areas where the patient receives more specialized care within no more than 60 minutes.

77.     For most of his career at the DMC, patients were boarding in the ER (staying in the ER waiting for a bed in the hospital) for no more than 90 minutes.

78. The target time for boarding in ER's is 60 minutes.

79. During the pandemic, patients at the DMC began boarding for days or even a week at a time.

80. The current median length of stay in the DMC's ERs is 2,203 minutes before patients are provided with a bed (36 hours, more than a day in a half).

81. A certain percentage of ICU patients stay for days before being admitted to a bed. In a typical ER setting, it is rare to have any ICU patients boarding in the ER.

82. On Memorial Day weekend 2022, Relator left and came back to sign off on patients who had been in the ICU for multiple, medically unnecessary days.

83. One patient with ventilator-assisted pneumonia was boarded in the ER instead of admitted elsewhere in the hospital for 117 hours.

84. On January 25, 2022, there were at least 6 patients in the ICU, with the longest length of stay at 235 hours (almost ten days ICU status), as follows (note that "LOS" means "length of stay" and "Avg LOS" means "average length of stay):



85.    That same day, the rest of the board was as follows:



86.     Likewise, on April 13, 2022, there were at least 6 ICU patients boarding in the ER, with the shortest stay at 24 hours, and longest 93, at least 84 patients in the ED, and a 27:10 hour average length of stay:



87.     Similarly, on April 16, 2022, with 81 patients in the emergency department, there were 2 ICU patients still boarding in the ER and a 26:55 hour average length of stay:



88.    On April 22, 2022, with 95 patients present, there were four in ICU status, a total average length of stay of 17:35 hours, some patients boarding for almost 200 hours, and the long boarding times led to 2 leaving against medical advice:



89.    On April 25, 2022, there were 99 patients in the emergency department,

with five in ICU status and again, some with other 100 hour lengths of stay:



90.    MCES data from May 2022 showed extremely long boarding times at

all Detroit-area DMC hospitals:

| All MCES Locations | Current Month to Date | Trend This Month vs Prior 3 | 3 Month Rolling Average | Same Month Last Year |
|---|---|---|---|---|
| EHR Arrivals Per Day | 396 | ▼ | 396 | 493 |
| Admission & Obs IP Admission % | 17.8% | ▼ | 21.9% | 22.1% |
| Left Without Being Seen % | 8.4% | ▲ | 5.9% | 6.2% |
| Median Door to 1st Prvdr (min) | 28 | ▲ | 22 | 20 |
| Median TAT Discharged Pts (min) | 225 | ▲ | 207 | 206 |
| Median TAT Admitted Pts (min) | 1,439 | ▼ | 1,618 | 970 |
| Total CT's Performed per 100 Pts Seen | 29 | ▼ | 36 | 34 |
| % of Discharged Pts Prescribed an Opioid | 4.7% | ▲ | 4.2% | 4.2% |
| % Admitted Pts Billed w_LVL5 or CC | 0.0% | ▼ | 96.9% | 99.4% |
| Avg Work RVUs Per Hour (billed) | 2.2 | ▲ | 2.0 | 2.5 |

| Detroit Receiving Hospital | Current Month to Date | Trend This Month vs Prior 3 | 3 Month Rolling Average | Same Month Last Year |
|---|---|---|---|---|
| EHR Arrivals Per Day | 153 | ▲ | 132 | 166 |
| Admission & Obs IP Admission % | 17.7% | ▲ | 22.0% | 20.4% |
| Left Without Being Seen % | 7.0% | ▼ | 7.2% | 4.2% |
| Median Door to 1st Prvdr (min) | 19 | ▲ | 17 | 14 |
| Median TAT Discharged Pts (min) | 232 | ▲ | 220 | 188 |
| Median TAT Admitted Pts (min) | 2,203 | ▲ | 1,693 | 1,086 |
| Total CT's Performed per 100 Pts Seen | 27 | ▼ | 33 | 33 |
| % of Discharged Pts Prescribed an Opioid | 3.9% | ▲ | 3.4% | 3.7% |
| % Admitted Pts Billed w_LVL5 or CC | 0.0% | ▼ | 92.1% | 99.4% |
| Avg Work RVUs Per Hour (billed) | 1.8 | ▲ | 1.5 | 1.9 |

| Harper University Hospital | Current Month to Date | Trend This Month vs Prior 3 | 3 Month Rolling Average | Same Month Last Year |
|---|---|---|---|---|
| EHR Arrivals Per Day | 88 | ▲ | 84 | 112 |
| Admission & Obs IP Admission % | 13.6% | ▲ | 17.4% | 21.4% |
| Left Without Being Seen % | 21.5% | ▼ | 6.2% | 6.2% |
| Median Door to 1st Prvdr (min) | 41 | ▲ | 25 | 20 |
| Median TAT Discharged Pts (min) | 226 | ▲ | 188 | 208 |
| Median TAT Admitted Pts (min) | 3,232 | ▲ | 3,194 | 878 |
| Total CT's Performed per 100 Pts Seen | 16 | ▼ | 26 | 20 |
| % of Discharged Pts Prescribed an Opioid | 4.6% | ▲ | 4.4% | 4.6% |
| % Admitted Pts Billed w_LVL5 or CC | 0.0% | ▼ | 99.6% | 100.0% |
| Avg Work RVUs Per Hour (billed) | 2.8 | ▼ | 2.8 | 4.1 |

| Huron Valley-Sinai Hospital | Current Month to Date | Trend This Month vs Prior 3 | 3 Month Rolling Average | Same Month Last Year |
|---|---|---|---|---|
| EHR Arrivals Per Day | 63 | ▲ | 55 | 61 |
| Admission & Obs IP Admission % | 24.0% | ▲ | 27.0% | 26.0% |
| Left Without Being Seen % | 1.4% | ▲ | 0.9% | 5.2% |
| Median Door to 1st Prvdr (min) | 21 | ▲ | 20 | 26 |
| Median TAT Discharged Pts (min) | 164 | ▼ | 180 | 210 |
| Median TAT Admitted Pts (min) | 482 | ▼ | 669 | 634 |
| Total CT's Performed per 100 Pts Seen | 38 | ▼ | 45 | 41 |
| % of Discharged Pts Prescribed an Opioid | 6.4% | ▼ | 7.2% | 7.8% |
| % Admitted Pts Billed w_LVL5 or CC | 0.0% | ▼ | 99.6% | 100.0% |
| Avg Work RVUs Per Hour (billed) | 2.9 | ▲ | 2.7 | 3.5 |

| Sinai-Grace Hospital | Current Month to Date | Trend This Month vs Prior 3 | 3 Month Rolling Average | Same Month Last Year |
|---|---|---|---|---|
| EHR Arrivals Per Day | 177 | ▲ | 149 | 187 |
| Admission & Obs IP Admission % | 17.6% | ▲ | 22.6% | 22.8% |
| Left Without Being Seen % | 5.7% | ▼ | 6.4% | 8.1% |
| Median Door to 1st Prvdr (min) | 41 | ▲ | 27 | 28 |
| Median TAT Discharged Pts (min) | 253 | ▲ | 222 | 221 |
| Median TAT Admitted Pts (min) | 1,767 | ▲ | 1,803 | 1,068 |
| Total CT's Performed per 100 Pts Seen | 34 | ▼ | 43 | 42 |
| % of Discharged Pts Prescribed an Opioid | 4.7% | ▲ | 3.5% | 3.1% |
| % Admitted Pts Billed w_LVL5 or CC | 0.0% | ▼ | 99.5% | 98.9% |
| Avg Work RVUs Per Hour (billed) | 2.2 | ▲ | 2.0 | 2.4 |

91.     It is worth noting that ER and ICU billing rates are some of the highest in the hospital, and so this increase in time spent in these areas is enormously profitable to a for-profit company like Tenet Health.

92.     The DMC's ICUs have their own medical staff including both fellows and attending staff who have completed a residency in internal medicine. But when a patient that is ICU status is boarding in the ER, the ER physicians care for them.

93.     The staff is so critically low, DMC even closed the observation unit because of lack of staff.

94.     At the DMC currently, orders for ICU are placed and then patients remain in the ER for days on end due to lack of staff to care for them elsewhere. But Tenet Health is still billing for their care as if they are in the ICU from the moment the ER physician places the orders for ICU care.

### ICU Staff-to-Patient Ratios Grow

95.     In addition to billing for ICU services when patients are not actually in the ICU, Tenet Health is billing for ICU services without actually delivering ICU-level care.

96.     When hospital patients do not have the nursing ratios required, their disease process will do worse and patient outcomes drop.

97.     CMS Codes describe critical care services as the "direct delivery by a physician(s) or other qualified health professional (QHP) of medical care for a critically ill/injured patient in which there is acute impairment of one or more vital organ system, such that there is a probability of imminent or life-threatening deterioration of the patient's condition. It involves high complexity decision-making to treat single or multiple vital organ system failure and/or to prevent further life-threatening deterioration of the patient's condition." 2022 CPT Codebook 31-33.

98.     Due to the assumption that such services are provided on a 1:1 or near 1:1 basis and the fact that care is billed in 30-minute increments after the first 30-74 minutes, 2022 guidelines specifically provide that such services must be fully

devoted to the patient, and time under Codes such as 99291 and 99292 (which report the duration of time spent) cannot be counted as if the time was spent with any other patient.

99.     During the pandemic, Tenet ICU nursing ratios became far outside of the standard of care, with the hospital routinely having over 10 patients per nurse.

100.    With higher patient to nurse ratios, patients do not receive the same level of care that would otherwise be available with a properly staffed organization.

101.    Medical billing experts caution that staffing at this level is not truly ICU-level care.

102.    Due to staff shortages, DMC's ICU services are not being provided even though they are still being billed at the same rate.

103.    As stated, at Tenet, billing staff immediately commence billing for care upon ICU admission whether or not the care is actually occurring in the ER and ICU.

104.    The problem is most pronounced with patients needing ICU care. The standard of care for ICU nursing ratios are supposed to be 2:1 or at most, 3:1. This is because patients with intensive care status require high frequency revaluation, testing, medications given, and medication titration.

105.    In true ICU care, there is oftentimes one fully dedicated or even more than one fully dedicated staff watching a single patient.

106. Take stroke victims, for example. The clinical treatment for strokes often involves administering tissue plasminogen activator ("TPA") in the early stages in order to minimize long term negative effects. The standard of care for this treatment requires 1:1 staff to patient ratios in order to ensure patients receiving TPA intravenously (via "IV") are closely monitored for changes in their neuro and vital signs.

107. Yet stroke center staff at the DMC routinely report not being able to properly monitor patients, because there are not enough staff present to provide the care.

108. Another example is patients on ventilators, which was a common occurrence with Covid-19 patients. The standard of care for these and other ICU patients is no more than 2:1, with some instances of being able to have 3 staff to 1 patient.

109. The discrepancies from the standard of care that medical billing codes are based on and what is happening at Tenet is extreme: Relator has seen ratios as high as 80+ patients for a single ICU nursing attendant.

110. With so many patients being monitored by a single person, it is clinically impossible to provide the ICU care that is actually being billed for.

111. In Relator's experience, medical record notes easily hide this discrepancy, because the records will reflect that the patient does indeed have a

health scenario requiring ICU care, and the billings seem to reflect typical standard of care treatment. However, the nursing roster (which is not submitted to CMS) and payroll records compared to the patient charts (which likewise are not submitted with bills) show that the billed-for services were not actually provided.

112.   On Christmas Eve 2021, there were only 3 nurses are working in the entire Detroit Receiving ER, and many patients admitted to the ICU at that time.

113.   This lack of nurses does not qualify as ICU care under the standard of care or billing codes.

114.   For example, patients on ventilators for Covid treatment would spend 80 hours in the emergency department due to insufficient staff to treat the patient, and Tenet Health would bill for their treatment as if the staff volumes were at pre-pandemic levels, but in truth, there would as few as 8 registered nurses ("RNs") in the entire emergency department treating 90 patients, making most of the care billed for physically impossible.

115.   Such billing is also blatant fraud because ICU care is billed as if the patient is getting around-the-clock treatment, but in truth, patients were largely left alone, marginally cared for.

116.   This same practice extrapolates to regular ER floor patients, where it is harder to spot fraud because the patients are healthier, but Relator realized that these patients, too, are getting their treatment billed as if there are pre-pandemic staffing

levels providing regular care, but there is no such staff in the hospital providing the proper treatment.

## Tenet Endeavors to Hide the Fraud

117.   Despite Tenet billing Medicare and Medicaid as if ICU patients are getting aggressive treatment in the ER, due to staffing shortages, the medical care is abhorrent.

118.   Tenet Health has a vested financial interest in keeping staff low and billings high because as a publicly-traded corporation, this results in extremely high profit margins on ER healthcare.

119.   RN wages have also gone up due to staff shortages, creating further incentives for hospital administrators to keep staffing levels low.

120.   While RN levels were low at nearly every hospital in the first part of 2022, this trend alone cannot account for how thin the staffing levels at Tenet Health are kept.

121.   The Tenet RN staff is painfully aware that patients are not receiving the care they need and are continuously dismayed about the lack of care, leading to staff burnouts and thus further drops in staffing levels.

122.   It is one thing to have an intermittent crises where something happens or some of the staff is sick, but every day of every week, Tenet Health's staffing levels are problematic.

123.   The cuts are not limited to RN staff. Physicians who run observation units at the DMC were notified by Tenet Health on Friday, May 28, 2022 that they were being laid off effective next Monday. (One such physician had worked at the hospital for 28 years). That literally leaves patients relying entirely on private physicians and observation providers.

124.   Tenet Health has gone to great lengths to hide these problems. One day in June of 2021, Relator was working in the ER and was pleasantly surprised to see that the hospital actually had enough staff to provide the required care. He thought briefly that Tenet Health had finally decided to increase its staffing levels to medically necessary levels. He texted the department director asking how it was possible when every day for months there had been stretchers in the hallways and ICU patients in the department for more than 24 hours, but there was suddenly more staff present. But the truth was that Tenet had hired marketers to take pictures that day and so wanted the ER to look properly staffed, and once the marketing shoots were complete, most of the staff disappeared.

125.   Tenet Health administrators routinely claim in meetings that they are trying to hire more staff to address the problem. But they are running the hospital with typical private equity goals of keeping staff extremely low in order to maximize profits. While this may make sense in other industries, in hospitals, it hurts patients and presents an avenue to submit inflated and fraudulent charges.

126.   The Director of Medical Education raised concerns with Tenet Health that the number of non-care requirements for residents is falling outside of Accreditation Counsel for Graduate Medical Education ("ACGME") Guidelines and thus the hospital should retain more staff before its residencies are put in jeopardy. Those concerns are being rebuffed.

127.   At a recent Graduate Medical Education Executive Committee Meeting attended by Relator in his role as the ER Residency Director, the CEO of the DMC, Brittany Lavis, claimed Tenet Health is doing everything it can to hire more staff, and she requested that all residency directors submit ideas about how to retain and recruit staff.

128.   Relator came up with a process to hire young people (18-21) from Wayne State University that would need a small amount of training and then become technicians or nurses. A program called DMC Jumpstart was started, but everyone who ran it soon left the DMC.

129.   At MCES, monthly staff meetings at MCES address the lack of staff. For example, the May 2022 meeting included a discussion about delay providing an EKG, a patient with severe burn that needed an operation to restore blood flow but instead waited in the lobby, a hallway patient who ran out of oxygen in the hallway, and other egregious care issues that would never occur if true acute-level care was being provided.

130.   Tenet has not changed its billing practices to reflect what is actually occurring in the DMC ERs (and the rest of the hospital).

131.   To make a show of addressing problems, Tenet Health encourages physicians to report concerns on the MIDAS electronic database system, a system for anonymously reporting patient safety concerns. However, the Tenet Health MIDAS system is only a way to put information in, and physicians have no way to follow up or track information, seemingly by design. Multiple times, Relator put his full name and phone number into MIDAS reports and asked for follow-up in attempt to get some traction addressing the problem, but there was never any follow-up by Tenet Health. Thus Co-Relator began backing up his MIDAS reports with emails.

132.   For example, on April 6, 2022, a patient had low oxygen but was kept in the hallway rather than receiving care for this acute diagnosis. Relator placed a MIDAS report but never heard back:

133.    Needless to say, MIDAS reports would only reflect patient outcome concerns, not that the system is billing for care that is not actually provided.

134.    Tenet also tries to make a show of addressing the issues by asking physicians to participate in root cause analyses (RCA) for old cases in the transitional care unit, as explained in a recent email from an administrator:

I was signed out multiple ICU patients however I was particularly concerned with a 51-year-old female who had chronic kidney disease stage IV who presented in decompensated failure to the initial providers in resus, coded, and received 2 rounds of CPR when cardiac arrest occurred in the resuscitation bay. They did get the patient back and eventually found the patient's labs indicated severe hyperkalemia, ARF, acute liver injury, and possible sepsis. The patient was quickly admitted to medical ICU and nephrology was brought on board for ARF with hyperkalemia. Patient was placed in the TCU [transitional care unit]. Nephrology was unable to do dialysis stating the patient's blood pressure was too low and lack of nursing staff. Patient was already on two pressers and a bicarb drip. At this time the patient was signed out to us.

Dialysis nor CRRT [continuous renal replacement therapy] had yet to been started. Nephrology note recommended CRRT. I was alerted that the patient was hypotensive and I did find her to be in a wider complex tachycardia and was given medical therapy. I did speak with nephrology again myself and they stated that the only way for CRRT to be done was that patient would have to be in the medical ICU. I did talk with the medical ICU fellow who stated that she did not have any available beds, nurses, and she even tried to talk to Harper for an ICU bed but there was nothing further that they could do from their end. I had to medically treat multiple times, which we all no has no lasting effect in renal failure. Patients hemodynamic status continued to decline and we were helpless to prevent further worsening. At this time I did call the MOD to alert them of the situation.

Roughly one hour later another MICU patient in TCU spot 2 went into cardiac arrest and the module 4 doctors ran that code without MICU because MICU was upstairs coding one of their patients in 5Q. 10 minutes after their code stated, I was alerted to another one of my MICU signouts who was a COPD exacerbation currently on a ventilator was coding.  Patient was getting active CPR until I disconnected the patient from the ventilator and releaved her breath stacking. We did ventilator adjustments, placed CVC's on a signout of 38 hours, as well as medications to stabilize them.  During this, I was then again called back to TCU for TCU 11, the medical ICU signout as noted above was now coding. We coded the patient and pronounced her dead at 0414. Its also notable that the other TCU code in spot 2 died in the ED.

Throughout all of the we had 6 nurses including the lead, 1 tech only until 3am, 14 ICU patients, and 50 admitted patients. For realistic nursing rations we would have needed to have over 20 nurses and at least 10 tech's. Again, I want to advocate for my patients, the nurses, and fellow residents and state that I feel that this situation is no less than an internal disaster. We are in a situation where preventable deaths and unnecessary morbidity are occurring, as demonstrated by tonight.

To summarize

xxx deceased

yyy, deceased

zzz, coded once, alive upon my signout in critical condition

At the time of sign out in the morning there were 61 patients in the department and only one patient had an active workup.

135.   Tenet has even publicly punished and even fired physicians who are vocal about problems caused by its low staffing levels.

136.   The staffing shortages at the DMC are particularly galling because the DMC is no longer a charitable organization struggling to make ends meet; it is owned by a highly profitable corporation that just received $2 billion in federal aid. Tenet Health has the funds to provide the care, and they are billing for the care, but they refuse to act and work to bolster profits on the backs of taxpayers.

137.   Tenet has also made a show of pretending to be working on the staffing levels, repeatedly telling leadership such as Relator that they are actively recruiting staff, while never actually investing in the necessary recruitment.

138.   While Tenet Health's drop in patient care quality and low staffing levels has been publicly exposed, its current practice of excessive boarding times in ER and ICUs for admitted patients and failure to provide acute-level care for patients with orders for such care have to date not been the source of any public disclosures.

139.   On a February 8 2022 earnings call, Tenet executives advised investors that the company is growing "with multiple sources of consistent revenue, free cash flow and growing profits" after having spent "the last couple of years trimming the

fat in its hospital business." Tenet reports ending 2021 with recorded $915 million in profit ($8.43 per share).[4]

140.    In July of 2022, when this Complaint is filed, Tenet's stock is rated a "buy" by major institutions such as RBC Capital due to these strong earnings and is even an investment of choice for a Swiss bank, Zurcher Kantonalbank Zurich Cantanalbank, which reports $1.04 million holdings in Tenet.

## COUNT I – VIOLATION OF
## FEDERAL FALSE CLAIMS ACT 31 USC § 3729(a)(1)(A) and (B)

141.    Relator incorporates by reference each and every preceding paragraph as if each was set forth again. To the extent the following allegations conflict with the preceding ones, the following are pled in the alternative.

142.    The False Claims Act at 31 U.S.C. § 3729(1)(A) ("Act") prohibits knowingly presenting, or causing to be presented (such as through a billing company), a false or fraudulent claim for payment or approval.

143.    Further, the Act at § 3279(1)(B) prohibits knowingly making, using, or causing to be made a false record or statement, such as those submitted for ICU care by Tenet Health.

144.    The Act defines "knowing" and "knowingly" as actual knowledge, or deliberate ignorance of the truth or falsity of the information, or reckless disregard

---

[4] Wall Street valuations pigeonholing Tenet Healthcare 'mostly as a hospital company,' chairman complains | Fierce Healthcare

for the truth. § 3279(b)(1). Thus, Tenet Health's failure to properly act to change its billing practices based on what is happening day-to-day in the ER and ICU is not a defense to the action.

145.   The Act defines a "claim" for payment to include any claim for payment, such as those submitted to Medicaid and Medicare. § 3279(b)(2).

146.   The above actions of (a) an extreme disconnect between services ordered and billed for and actually provided; (b) excess boarding times and billing for ICU care before patients reach the ICU; and (c) billing for acute-level ICU care without proving medically appropriate ICU care, constitute the false submission of medical billing claims by Tenet Health.

147.   Further, the staff shortages are so extreme at all DMC hospitals, that claims are being submitted in other areas where the medically-necessary care billed for is not actually provided.

148.   Tenet Health in the course of billing for such services has submitted acute-care billing codes which knowingly, falsely represent the medical necessity of continued ER and ICU care.

149.   Tenet Health in the course of billing for such services has also submitted claims for acute care falsely, without ensuring the acute care services ordered by physicians and included in the codes are delivered to the patients qualifying for Medicare and Medicaid services.

150.   While Tenet Health's drop in patient care quality has been publicly exposed, its current practice of excessive boarding times in ER and ICUs for admitted patients and failure to provide acute-level care for patients with orders for such care has not been publicly disclosed.

151.   As described above, Defendants submitted false claims and violated the False Claims Act, and are liable for all damages, penalties, and fines as set forth in said Act, as well as all other applicable relief.

## COUNT II – VIOLATION OF MICHIGAN'S MEDICAID FALSE CLAIM ACT MCL § 400.601a(1)

152.   Relator incorporates by reference each and every preceding paragraph as if each was set forth again. To the extent the following allegations conflict with the preceding ones, the following are pled in the alternative.

153.   The Michigan Medicaid False Claims Act, MCL § 400.601 et seq. ("MI Act"), prohibits the submission of false claims for payment and regarding the conditions of medical facilities in connection with the determination of benefit payments. § 603, 605, 606.

154.   The MI Act defines "false" as "wholly or partially untrue or deceptive" and "deceptive" as "statement of fact or that fails to reveal a fact, which statement or failure leads the department to believe the represented or suggested state of affair to be other than it actually is." MCL § 400.602(c) and (d).

155.   The MI ACT defines "knowing" and "knowingly" as a person, corporation or other legal entity that is "in possession of facts under which he or she is aware or should be aware of the nature of his or her conduct and that his or her conduct is substantially certain to cause the payment" under a program under the social welfare act. § 400.602(f), (g), (h).

156.   Tenet Health is or should be aware that its excess boarding times and lack of RN staff makes its claims for ER and ICU payment false and renders its claims about the provision of ICU services false.

157.   The above actions (a) excess boarding times and billing for ICU care before patients reach the ICU; and (b) billing for acute-level ICU care without proving medically appropriate ICU care, constitute the false submission of medical billing claims by Tenet Health.

158.   Further, the staff shortages are so extreme at all DMC hospitals, that claims are being submitted in other areas where the medically-necessary care billed for is not actually provided.

159.   As described above, Tenet Health submitted false claims and violated Michigan's Medicaid False Claim Act in the course of their ER, ICU and other medical care, and are liable for all damages, penalties, and fines as set forth in said Act, as well as all other applicable relief.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Relator respectfully requests that this Court enter judgment:

(1) in favor of the United States for treble damages, expenses, attorneys' fees, and costs in connection with this action;

(2) against Defendant and in favor of the United States for civil penalties in statutorily-determined amounts for each false claim;

(3) for an award to Relator for the maximum qui tam relator's portion permitted; and

(4) for an award to Relator for his reasonable expenses, attorneys' fees, and costs incurred in connection with this action; and

(5) awarding damages in an amount to be determined at trial any other relief that this Court deems appropriate, just and equitable.

## JURY DEMAND

Plaintiff hereby demands a jury on all issues so triable.

**MACWILLIAMS LAW PC**

/s/ *Sara K. MacWilliams*
Sara K. MacWilliams (P67805)
838 W. Long Lake Rd., Ste. 211
Bloomfield Hills, MI 48302
(248) 432-1586
sm@macwilliamslaw.com

**THE HOWARD LAW FIRM, PLC**

/s/ *Derek T. Howard*
Derek T. Howard (P69625)
838 W. Long Lake Rd., Ste. 100
Bloomfield Hills, MI  48302
(248) 237-7300
derek@howardfirmplc.com

Dated: July 13, 2022