UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA AND
THE STATE OF MICHIGAN
EX REL. ERIK OLSEN, M.D.,
SAJITH MATTHEWS, M.D.,
AND WILLIAM BERK, M.D.,

          Plaintiff Relators,

              v.

TENET HEALTHCARE
CORPORATION; AND DETROIT
MEDICAL CENTER,

          Defendants.

_____/

Case No. 22-cv-11590

U.S. DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

## OPINION AND ORDER: (1) MOOTING RELATORS' MOTION TO CONSOLIDATE [ECF No. 27]; AND (2) GRANTING DEFENDANTS' MOTION TO DISMISS [ECF No. 28]

## I.   Introduction

Plaintiff Relator Erik Olsen, M.D., filed the above captioned lawsuit on July 13, 2022. The Complaint was amended January 18, 2024, to include Sajith Matthews, M.D., and William Berk, M.D. as relators (the "Relators"). The Amended Complaint purports to allege claims under the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. § 3729 (the "FCA"), and the Michigan Medicaid False Claims Act, M.C.L. § 400.610a(1) (the "MMFCA"). It names Tenet Healthcare Corporation

1

("Tenet") and Detroit Medical Center ("DMC") as Defendants. This lawsuit had a companion case that was pending before this Court before it was dismissed on July 30, 2024: *Matthews et al v. Tenet Healthcare Corporation et al* (Case No. 23-cv-10903). The parties and underlying facts of both cases are identical. The United States and the State of Michigan have both declined intervention and the respective complaints were unsealed in October 2023.

Before the Court are two matters. First, Relators filed a Motion to Consolidate Cases [ECF No. 27] on March 22, 2024. Defendants responded and Relators did not file a reply. Second, Defendants filed a Motion to Dismiss on March 22, 2024. Relators responded on April 12, 2024, and Defendants replied on April 26, 2024. The motions are fully briefed.

Upon review of the briefing and applicable authority, the Court concludes that oral argument will not aid in the resolution of this matter. Accordingly, the Court will resolve the motions on the briefs. *See* E.D. Mich. L.R. 7.1(f)(2). For the reasons set forth below, Relators' Motion to Consolidate is **MOOT**. Defendants' Motion to Dismiss is **GRANTED**.

## II.    Factual and Procedural Background

Relators are physicians who practiced at Detroit Receiving Hospital and Sinai-Grace Hospital. Tenet is a parent corporation for those hospitals and DMC is an assumed name. On July 13, 2022, Relator Erik Olsen filed a *qui tam* complaint

under seal in this Court against Tenet. Olsen asserts that Tenet was fraudulently billing for services rendered as inpatient while patients were held, i.e., "boarded" in the emergency room ("ER"). *Id*. After the United States and the State of Michigan declined intervention, this Court issued an Order on October 30, 2023, unsealing the *Olsen* complaint. ECF No. 16, PageID.86-88. Relator Olsen subsequently filed an Amended Complaint on January 18, 2024, adding Relators Sajith Matthews and William Berk as plaintiffs, and DMC as a defendant. ECF No. 19, Page ID.93-137.

Relators submit that they are "highly respected emergency room and internal medicine physicians with decades of experience," who practiced at Detroit Receiving Hospital. ECF No. 19, PageID.73. The Amended Complaint asserts violations of the FCA and MMFCA based on allegations regarding Defendants' alleged conduct during the COVID-19 pandemic, *inter alia*. Additionally, Relators aver that "Defendants refuse to spend resources to provide care for the crowded ERs created by the boarded patients." *Id*., at PageID.73. And "boarded patients in Defendants' ERs not only do not receive the billed-for inpatient care, frequently they do not even receive the observation level of care required in an ER setting." *Id*. "[P]atients are dying[,]" Relators say, "despite Tenet receiving significant tax payor resources to treat them[.]" *Id*. Further, Relators contend that "[w]hile some boarding in ERs is normal and even perfectly acceptable if staff is available to provide the necessary care, Tenet is well aware that such staff is often nonexistent[;] but [Tenet]

3

is boarding for excessive ratios and billing for ICU care without this staff being available, day after day, for profit." *Id.*, at PageID.73.

Relators point to six "examples" of patients who were allegedly harmed by these practices. In the amended complaint, they allege the following facts as to all six patients.

122. Patient 1 was admitted to Detroit Receiving Hospital's ER from a nursing home with a diagnosis of Sepsis. Patient 1 had an admit order date to the ICU of August 2, 2022, at 02:43.

123. Patient 1 was boarded in Detroit Receiving Hospital's ER for almost seven days awaiting an inpatient bed, while the records were maintained as if the patient had been properly admitted and was receiving inpatient care.

124. Eventually, a proper transfer to an inpatient unit was documented in the patient's chart.

125. Relators note that Patient 1's medical chart does not reflect ICU level care; in fact, his chart does not document vitals being checked and has no nursing notes in the chart for over 135 hours.

126. Sadly, but not surprisingly, Patient 1 died on August 16, 2022.

127. Patient 2 has an admit order to the Neuro ICU on August 4, 2022, at 17:39 with a diagnosis of alcoholism, encephalopathy, and a urinary tract infection.

128. Patient 2 was boarded in the ER for approximately 3 days before being properly transferred to the ICU on August 7, 2022, at 14:42.

129. Relators review of Patient 2's medical chart reveals that while in the ER supposedly receiving (and being billed for) inpatient care, Patient 2 was not properly started on feeding, vitals were not checked, and he was not started on a long-term EEG as requested by neurology consultants.

4

130. Patient 3 presented to the ER at Detroit Receiving Hospital with an infected corneal ulcer in her eye and was prescribed eyedrops every hour.

131. Because of the critical nature of the care, Patient 3 received an admit order to DRH's ICU on February 22, 2022, at 19:23, because that was the only department capable of monitoring and delivering hourly eyedrops.

Unfortunately, Patient 3 was boarded in the ER for approximately eight days without receiving the hourly eyedrops she required.

133. As a result, she sustained a rupture of her eye globe, necessitating its removal. She was finally transferred to the ICU on March 2, 2022.

134. The substandard care Patient 3 received was billed as if it were inpatient ICU care, despite being in the ER for close to eight days.

135. Patient 4 was a 78-year-old female who presented to the ER at Detroit Receiving Hospital severely ill with sepsis, rhabdomyolysis, severe dehydration, and hyperosmolar coma.

136. Patient 4 had an admit order to the MICU on December 23, 2021, at 18:51.

137. Patient 4 was "downgraded to floor bed" from ICU status on December 26, 2021, although she remained in the ER the entire time, until she was properly transferred to a floor bed on December 29, 2021, at 23:50.

138. Patient 4 was boarded in the ER in excess of six days, despite her chart indicating she needed ICU care (for three days) and an inpatient floor admission (for the other three days).

139. Relator Matthews personally found Patient 4 in her own urine and stool, and due to this improper care, Patient 4 developed decubitus ulcers during her more than six days in the ED. Again, Patient 4's care was billed as if she were cared for as a proper inpatient both in the MICU and a floor bed—even though neither occurred—for six days.

5

141. Patient 5 was an 88-year-old male who presented to Detroit Receiving Hospital's ER with respiratory failure due to COVID-19.

142. Patient 5 had an admit order of August 3, 2022.

143. Patient 5 died in the ER after being boarded there for approximately thirty-six hours.

144. Nursing notes indicate that Patient 5 was found expired on August 4, 2022, at 22:40, with his BiPAP breathing apparatus disconnected. It is unknown when the BiPAP was removed or when exactly Patient 5 died.

145. Patient 5's care was billed as inpatient care while he was in the ER and apparently during the time during which he lay deceased, with no one even monitoring whether his BiPAP apparatus was properly engaged.

146. Patient 6 was a 79-year-old female admitted by a DMC physician for low hemoglobin; she was very ill when admitted but cognitively fine.

147. Patient 6 remained sitting in the hallway for a day, such that when the physician returned to the hospital after going home to sleep, Patient 6 was in the hallway unattended in front of some linen cabinets, lying in her own feces and urine.

148. Patient 6 was dehydrated and stated that she had been given no water, by anyone, for the entire time she was parked in the public hallway.

149. Patient 6 tearfully told the physician she would rather die than spend any more time in the ER.

150. By the end of her stay, Patient 6 had Covid.

151. No one had monitored Patient 6's hemoglobin the entire time from when a physician admitted her for low hemoglobin and when that same physician returned for a different shift.

ECF No. 19, PageID.121-125.

The crux of Relators' allegations center on the purported "protocol" and "deliberate choice made by Tenet and DMC," to "routinely bill Medicare, Medicaid and other government healthcare programs for inpatient care that was not delivered or capable of being delivered at DMC's acute care hospitals' emergency departments." *Id.*, at PageID.90 and 112.

Defendants urge the Court to dismiss Relators' Amended Complaint under the FCA's first-to-file rule. While Relators ask the Court to consolidate the instant matter into the *Matthews* case. However, the Court has dismissed *Matthews*, so Relators' motion to consolidate is moot.

Additionally, Defendants maintain that the complaint fails to assert a cause of action under the FCA or MMFCA because "Tenet and DMC are not proper parties" and it fails to plead a false claim as required by Fed. R. Civ. P. 9(b) and 12(b)(6). *See* ECF No. 28, PageID.156. The Court will discuss the applicable law and analysis below.

### III.    Applicable Law and Analysis

#### (A) The First-to-file Rule Does Not Require Dismissal of the Instant Action.

Under the "first-to-file" rule, the FCA provides that "[w]hen a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). The Sixth Circuit has clarified that this section "'unambiguously establishes a first-to-file bar, preventing *successive* plaintiffs from bringing related actions based on the same underlying facts.'" *Walburn v. Lockheed Martin Corp*., 431 F.3d 966, 971 (6th Cir. 2005) (emphasis added). The "first-to-file bar furthers the policy of the False Claims Act in that '[t]he first-filed claim provides the government notice of the essential facts of an alleged fraud, while the first-to-file bar stops repetitive claims.'" *Id*. Because Relators Matthews and Berk were added to this action through a Fed. R. Civ. P. 15(a) amendment ("Rule 15"), Defendants ask the Court to "hold that they impermissibly 'intervened' in the case in violation of the first-to-file rule." ECF No. 28, PageID.175.

In support of this position, Defendants rely on *Fry*, where the U.S. district court for the Middle District of Tennessee held that the first-to-file bar precludes the addition of a second relator through a Rule 15 amendment. *See U.S. ex rel. Fry v. Guidant Corp*., No. CIV.A. 3:03-0842, 2006 WL 1102397, at *6 (M.D. Tenn. Apr. 25, 2006). In that case, Fry was the first relator, he argued that a second relator "may be added as an additional relator because he [(the second relator)] [wa]s 'related' to Fry, [the second relator did not] file[] a formal motion to 'intervene,' and [he did]

not seek to bring a separate 'related action.'" *Id*. The court rejected Fry's arguments, finding that the addition of the second relator by amendment was barred by the first-to-file rule. *Id*. The court said that "to find otherwise would permit any potential relator to circumvent the first-to-file doctrine by seeking entrance to the action via amended complaint, thereby undermining a central purpose of Section 3730(b)(5)—the preclusion of plaintiffs with merely duplicative claims." *Id*., (*citing Walburn v. Lockheed Martin Corp*., 431 F.3d 966, 970 (6th Cir. 2005)). Ultimately, the court concluded that "Section 3730(b)(5) strictly forbids private parties, such as [the second relator], from being added as additional party relators with claims based on the same underlying facts ('intervening') after a qui tam action has been filed and the government has already been made aware of the essential facts of the alleged fraud." *Id.*

The *Fry* court's central holding relied on "the straightforward, exception-free interpretation of Section 3730(b)(5) adopted by the Fourth and Ninth Circuits." *Id*., at *6 (*citing United States ex rel. Lujan v. Hughes Aircraft Co*., 243 F.3d 1181, 1187 (9th Cir. 2001) and *United States ex rel. LaCorte v. Wagner*, 185 F.3d 188, 191 (4th Cir. 1999)). However, *Fry's* reliance on those cases renders its reasoning unpersuasive because the courts in *Lujan* and *Lacorte* did not address whether a Rule 15 amendment falls within the first-to-file bar. *Id*. Instead, the Fourth Circuit barred two nonparties who sought "to intervene[,] [under Fed. R. Civ. P. 24,] in a qui tam

9

action brought by two other individuals." *LaCorte*, 185 F.3d at 190–91. And the Ninth Circuit, deciding a case that did not involve the addition of a new relator by amendment, merely concluded in *Lujan* that Section "3730(b)(5)'s plain language unambiguously establishes a first-to-file bar, preventing *successive* plaintiffs from bringing related actions based on the same underlying facts." *Lujan*, 243 F.3d at 1187 (emphasis added) (collecting cases); *see also Walburn*, 431 F.3d at 971 (a Sixth Circuit panel that made a similar ruling). As another judge in this district previously said, "*Fry*'s reliance on [*Lacorte* and *Hughes*] was. . . misplaced, and the Court will not adopt its reasoning." *United States v. Allstate Ins. Co*., 620 F. Supp. 3d 674, 684 (E.D. Mich. 2022) ("*Allstate*").

In contrast to Defendants' position, Relators aver that "[a]lthough the Sixth Circuit has not addressed the issue of whether § 3730(b)(5) speaks to Rule 15 amendment, precedent in this Court recently agreed with the analysis of the Third and Tenth Circuits, both of which have found that adding relators through an amendment does not implicate § 3730(b)(5)." ECF No. 34, PageID.468 (*citing Allstate*, 620 F. Supp. 3d at 682). In *Allstate*, the court held that "adding a relator by amending complaint was not an 'intervention' prohibited by first-to-file bar" because "the first-to-file bar referred to intervention under" the federal rules of civil procedure and "did not bar any form of joinder." *Id*., at 682. In its rationale, the court

adopted the Third and Tenth circuits' narrow interpretation of the term "intervention[,]" defining it "as a technical term used in [Fed. R. Civ. P.] 24[.]" *Id*.[1]

"In contrast [(to intervention)]," the court said, "addition of a party through a Rule 15 amendment involves a different procedural mechanism. After all, an already-existing party brings a new party into the case under Rule 15 rather than the new party bringing itself into the case." *Id*., at 683. For this reason, the court concluded that "[i]t makes little sense why Congress would have used Rule 24's plain procedural term yet intended 'intervene' to include all kinds of joinder under the Civil Rules." *Id*. With respect to the Sixth Circuit's determination in *Walburn*—that Subsection (b)(5) "unambiguously establishes a first-to-file bar, preventing *successive* plaintiffs from bringing related actions based on the same underlying facts"—the court said the ruling means that the "bar against nonparties 'bringing a related action based on the facts underlying the pending action' applies to successive

---

[1] The Third and Tenth Circuits have "explicitly acknowledged that adding a relator through an amendment does not implicate Subsection (b)(5)." *Id*., at 682. *See In re Plavix Mktg., Sales Pracs. & Prods. Liab. Litig.*, 974 F.3d 228, 236 (3d Cir. 2020) ("The [FCA's] first-to-file bar stops new relators from intervening in other parties' suits or bringing their own separate suits based on the same facts. Yet it does not bar parties from amending a complaint to add, remove, or swap relators."). *See also United States ex rel. Little v. Triumph Gear Sys., Inc*., 870 F.3d 1242, 1247 (10th Cir. 2017) ("[W]e held that two new relators didn't 'intervene' in violation of § 3730(b)(5) when the original plaintiff added the relators through a Rule 15 amendment.") (*citing United States ex rel. Precision Co. v. Koch Indus., Inc*., 31 F.3d 1015, 1017–18 (10th Cir. 1994)).

Relators in separate actions, rather than co-Relators in the same action." *Id.* (citing *Walburn*, 431 F.3d at 971 (emphasis in original)).

The Court agrees with the interpretation of the term "intervene" adopted by *Allstate*, and the case law in the Third and Tenth Circuits. This interpretation is also consistent with the Sixth Circuit's discussion of § 3730(b)(5) in *Walburn*. Accordingly, the Court concludes that the addition of relators by amendment does not implicate the first-to-file rule. Matthews and Berk, though added to this case through Rule 15 amendment, are not intervenors or successive Relators in separate actions. Because of the amendment, Olsen, Matthews, and Berk are all co-Relators in the same action, which is not barred by § 3730(b)(5). For these reasons, the Court does not find that the first-to-file rule requires dismissal of Matthews' and Berk's claims.

Apart from the first-to-file rule, Defendants also contend that the Amended Complaint should be dismissed because "it is insufficiently pleaded" and Tenet and DMC are not proper parties to this action. ECF No. 28, PageID.175. The Court will discuss these arguments, the applicable law, and analysis below.

### (B) Legal Standard

In considering a Rule 12(b)(6) motion, the Court must treat all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences from those allegations in favor of the nonmoving party. *Lambert v. Hartman*, 517 F.3d

433, 439 (6th Cir. 2008). However, the court "need not accept as true legal conclusions or unwarranted factual inferences." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009). Rather, to survive a motion to dismiss, the complaint must "present enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp., v. Twombly*, 550 U.S. 544, 570 (2007). The pleading standard "'demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Indeed, a plausible claim to relief exists when the allegations properly pleaded set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

Additionally, the heightened pleading standards of Rule 9(b) apply to claims under the FCA. *See, e.g., U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 515 (6th Cir. 2007) ("Bledsoe II"). In *qui tam* actions, the heightened pleading requirements for fraud claims are met when a complaint sets out: "(1) precisely what statements were made in what documents or oral representations . . . [;] (2) the time and place of each such statement and the person responsible for making [the] same[;] (3) the content of such statements and the manner in which they misled the government[;] and (4) what the defendants obtained as a consequence of the fraud." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 878 (6th Cir. 2006) (*citing*

13

*United States ex rel. Clausen v. Laboratory Corp. of America, Inc*., 290 F.3d 1301, 1310 (11th Cir.2002) (internal quotations omitted).

Moreover, the Sixth Circuit "has imposed a clear and unequivocal requirement that a relator allege a specific false claim when pleading a violation of the Act" and, under Rule 9(b), the "[t]he identification of at least one false claim with specificity is an indispensable element of a complaint that alleges a False Claims Act violation." *U.S. ex rel. Owsley v. Fazzi Assocs., Inc*., 16 F.4th 192, 196 (6th Cir. 2021). Rule 9(b)'s rigorous requirements also demand specificity as to each Defendant. *See Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co*., 940 F. Supp. 1101, 1114 (W.D. Mich. 1996). A complaint "may not rely upon blanket references to acts or omissions by all of the 'defendants,' . . . each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged." *Bledsoe I*, 342 F.3d at 643.

Accordingly, Relators must plead with particularity: (1) a legally fraudulent scheme; and (2) at least one representative false claim violation by each Defendant. *See, e.g., U.S. ex rel. Ibanez v. Bristol-Myers Squibb Co*., 874 F.3d 905, 914 (6th Cir. 2017) ("Rule 9(b) requires relators to provide facts identifying a representative claim that was presented to the government, i.e., '[t]he actual submission of a specific request for anticipated payment to the government.'").

(C) **Analysis**

14

In their Amended Complaint, Relators maintain that the Defendants "bill government healthcare programs for ER boarded patients as if they were in the appropriate inpatient department as soon as an admission order is signed[,]" even in circumstances where "the patient is still physically present in the ER and is not receiving an inpatient level of care." *Id*., at PageID.90. Relators believe that Defendants engage in this conduct because inpatient care is "reimbursed at a higher rate than ER/outpatient level of care." *Id*.

In their motion, Defendants posit that "Relators do not provide plausible or particular allegations evidencing that Tenet or DMC 'boarded' any patients or billed for services." ECF No. 28, PageID.188. Indeed, Defendants say "there is not a single allegation of 'sufficient factual matter'– general, specific or otherwise – that Tenet (a parent corporation) or DMC (an assumed name of a parent corporation named VHS of Michigan, Inc.) furnished any actual hospital services or submitted a single hospital bill, much less a false one." *Id*. They further assert that "Tenet is a health system[,] a parent corporation", and it "does not furnish or bill for hospital services, nor do Relators adequately plead as much." *Id*. And "DMC is an assumed name register by VHS of Michigan, Inc., which Relators do not sufficiently plead as furnishing or billing for hospital services." *Id*. VHS of Michigan, Inc. is a parent corporation of individual hospital entities but none of them are named Defendants. *Id*.

15

It is a general principle of corporate law "deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61, 118 S. Ct. 1876, 1884, 141 L. Ed. 2d 43 (1998). Indeed, parent companies "'are not generally liable for the misdeeds of their subsidiaries . . . and the FCA does not alter that general rule.'" *United States ex rel. Nedza v. Am. Imaging Mgmt., Inc*., No. 15 C 6937, 2020 WL 1469448, at *11 (N.D. Ill. Mar. 26, 2020) (quoting *U.S. ex rel. Lisitza v. Par Pharm. Companies, Inc*., No. 06 C 6131, 2013 WL 870623, at *5 (N.D. Ill. Mar. 7, 2013) (citing *United States v. Bestfoods*, 524 U.S. 118 S. Ct. 1876 (1998)).

Rather, to survive a Rule 12(b)(6) motion in an FCA case, the "[r]elator must be able to demonstrate either that [the defendant] is liable under a veil piercing or alter ego theory, or that it is directly liable for its own role in the submission of false claims." *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp*., 498 F.Supp.2d 25, 60 (D.D.C.2007) (holding that a "parent corporation cannot be liable merely because a plaintiff alleges that its subsidiary violated provisions of the FCA") (quoting *United States ex rel. Tillson v. Lockheed Martin Corp*., 2004 WL 2403114, *33, 2004 U.S. Dist. LEXIS 22246 at *107 (W.D.Ky.2004)); *see also, United States ex rel Fent v. L–3 Commc'ns Aero Tech., LLC*, 2007 WL 3485395 at *3 (N.D.Okla.) ("The FCA does not, however, address whether a parent corporation may be liable

16

for the fraudulent and wrongful conduct of its subsidiary. *See* 31 U.S.C. §§ 3729–3730. Thus, courts must apply the veil-piercing test.").

Relators do not propose any basis for piercing the corporate veil. Rather, they submit that "[t]he provisions of the FCA 'attach liability, not to underlying fraudulent activity…, but to the claim for payment.'" ECF No. 34, PageID.473 (*quoting Sanderson v. HCA*, 447 F.3d 873, 877-878 (6th Cir. 2006)). "Neither Tenet nor DMC are required to have submitted a claim or boarded patients as individual defendants[,]" Relators say, "[t]he FCA reaches not only the entity or person who submits a false claim, but one who 'causes' a false or fraudulent claim 'to be presented.'" *Id*. In this way, Relators appear to argue that Defendants are liable for their own role in the purported FCA violations by causing a false claim to be submitted. They say, "it is Tenet and DMC's protocol to bill government healthcare programs as soon as an admission order is signed" and Defendants "have knowingly submitted false claims to government healthcare programs for ER-boarded patients that they know are neither treated in inpatient departments nor receiving inpatient level of care." ECF No. 19, at PageID.112-113.

Plaintiffs' allegations as to the named Defendants stop short of satisfying either Rule 12(b)(6) or Rule 9(b). They do not sufficiently allege that Defendants directly participated in the submission of any of the purported false claims. Critically, the factual allegations do not support a plausible inference that

17

Defendants directed their subsidiary hospitals to bill government programs while knowing that, at the time the billing period began, the hospitals failed to render the care required for payment of medical claims by the government.

The problem with Relators' argument is that they cite no authority demonstrating that Defendants' purported "protocol" amounts to affirmative act, as required to impart direct liability to a parent corporation under the FCA. Rather, Relators' Amended Complaint centers on Defendants' purported policy. Relators believe that Defendants generally encourage or require their subsidiary hospitals "to begin billing for inpatient care immediately [after an admission order is signed by a physician], despite knowing that patients are being held in the ER for significant periods of time[] and are not receiving inpatient care." ECF No. 34, PageID.459. Moreover, Relators allege that Defendants routinely fail to provide even the "observational" level of care that would be sufficient for ER patients.

These allegations do not satisfy Rule 9(b), and they are not sufficient to create a plausible entitlement to relief against Defendants. Even assuming *arguendo* that Defendants had a general policy and were generally aware of severe staffing issues and excessive boarding times, the factual allegations do not suggest that, with respect to each of the six individual patients, Defendants billed government healthcare programs despite knowing that their subsidiaries had failed to render care in compliance with regulations at the respective times in question. *See U.S. ex rel.*

*Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 530 (6th Cir. 2012) ("For a defendant to be liable under the False Claims Act, it must have acted knowingly; such knowledge can be actual, 31 U.S.C. § 3729(b)(1)(A)(i), or constructive, either because it acted in deliberate ignorance of the truth, 31 U.S.C. § 3729(b)(1)(A)(ii), or in reckless disregard of it, 31 U.S.C. § 3729(b)(1)(A)(iii)").

Relators point to emails and tracking systems, which they contend alerted Tenet and DMC to the general staffing issues and common practices of ER boarding at DMC. However, none of these communications show that Tenet and DMC knew the non-party hospitals were supposedly billing for services that were not being provided. Although the tracking systems may show periods of boarding, they do not suggest that inpatient services were not provided or that the hospitals were submitting false claims for such services. As Relators acknowledge, boarding itself is not illegal, nor have Relators sufficiently alleged that it constitutes fraud. *See* ECF No. 34, PageID.458 (Relators say that "the Amended Complaint does not allege that 'boarding' of patients is itself fraudulent."). Accordingly, Tenet's or DMC's alleged awareness that patient boarding was occurring at their hospital affiliates does not demonstrate liability. Relators do not allege that Tenet or DMC made or participated in staffing decisions at the non-party hospitals, including setting the staffing schedules or ensuring hospital coverage.

19

Relators also point to their description of six patients who treated at non-party Detroit Receiving Hospital, but Relators do not explain Tenet or DMC's involvement with respect to the care rendered or staffing issues, the allegations to do not say that either of them had knowledge of what claims were submitted, that services were billed, that a certain degree of care was or was not rendered, how the bills were paid, who paid the claims, or how the claims themselves were fraudulent. Further, Relators contend that "Defendants' policy is to fraudulently bill government payors for inpatient care as soon as an admit order is signed by a physician," however, such a policy is consistent with federal regulations. *See* 42 C.F.R. § 412.3(a) ("For purposes of payment under Medicare Part A, an individual is considered an inpatient of a hospital, including a critical access hospital, if formally admitted as an inpatient pursuant to an order for inpatient admission by a physician or other qualified practitioner . . .").

In these circumstances, the Court finds that, without allegations suggesting that Defendants made staffing decisions on behalf of the hospitals, and that they knowingly directed the hospitals to have physicians sign admission orders for patients and bill them as inpatients while they were boarded in the ER and not receiving care, liability for fraud cannot be imparted to Defendants as parent corporations.

**IV.    Conclusion**

20

For the reasons set forth above, Defendants' motion to dismiss is **GRANTED**.

**SO ORDERED.**

Dated:  August 23, 2024                          /s/Gershwin A. Drain
                                                 GERSHWIN A. DRAIN
                                                 United States District Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
August 23, 2024, by electronic and/or ordinary mail.
/s/Marlena Williams
Deputy Clerk

21